Case number 14-1149, Henry Idaho Conservation League, et al. Ms. Gooden for the Petitioners, Mr. Sullivan for the Respondents, and Mr. Junior Amato for Movement Intervenor NMA. Alright, Ms. Gooden. Good morning. Good morning. May it please the Court, my name is Amanda Gooden, and I represent Petitioners, Idaho Conservation League. I would like to reserve four minutes of my time for rebuttal. Thirty years ago, Congress directed EPA to issue financial assurance rules to reduce the harm from releases of hazardous substances. Congress intended these rules to provide a powerful incentive for best practices, and to ensure that when releases do occur, they're cleaned up quickly and thoroughly. EPA has found that for poor industries, their involvement with hazardous substances poses very high risk, but EPA still hasn't issued rules. I'd like to address three issues this morning. I'll start by addressing the threshold jurisdictional question of standing. Turning to the merits, I'll address EPA's clear duty to issue these rules. And third, to why EPA's delay is unreasonable under the track factors. Turning to the jurisdictional question first, we have standing because EPA's failure to issue these rules causes our members harm. Congress required these rules because they create a powerful financial incentive for facilities that handle these toxins to do it safely, and to reduce releases, and that will directly benefit our members. For example, Mark Romine, one of our declarants, lives just down the street from a coal plant in Kentucky. The toxic coal ash from the open storage pit blows down his street, and he breathes it every day. The plant also releases contaminated water from the retention pond into the river, and so he can't swim there anymore. EPA has failed to issue financial assurance rules that would apply to that plant and plants like it across the country, and would provide a powerful incentive for that facility to reduce their releases. You argue a lot about the congressional and EPA findings about the relationship between financial assurance rules and changes in polluting behavior. But I think our Florida Audubon decision said we can't rely on general congressional statements like that. We need to have a particularized showing for a particular plaintiff that that general principle will manifest itself. So with respect to Mr. Robeson, one of the declarants that you have here, he talks about the impending – it seems to be an impending operation at Mr. Midas Gold Mining Company. What's showing? Is there about the likelihood that that mining project by Midas Gold Mining will go forward? And then if it is, that financial assurance regulations will be needed specifically as to Midas Gold Mining to change the behavior or ensure protection for environmental harm. Well, Your Honor, so the Midas project has already taken several steps. They are pursuing that actively. From a concrete perspective, what does it mean pursuing it actively? Pursuing it actively as in they're studying still whether they're going to do the mining or they've started mining? They've started exploration. They haven't started the actual project yet. So we have several declarants that speak to hard rock mining, and there are different stages of the process for each of these projects. With the Midas project, it's at the exploration stage. For Mr. Weber in Utah, that project is ongoing, has been for some time, and it will continue. And then – I'm going to turn it down to Robin. Which one do you have that shows – that has evidence about the financial status of an ongoing operation or certainly impending operation by Midas or some other company so that we would have an appreciation for particularizing the general congressional concern that you rely on? Your Honor, to show exactly what a specific facility will do in response to these rules really requires knowing what EPA is going to put in these rules ultimately. So we need to know what practices EPA will attach higher assurances to. We think those should be the riskier practices, and what practices EPA will attach lower assurances to. And with that knowledge, then, that will give facilities a powerful incentive to avoid the practices. I think to help you on standing, that seems to sound like you're saying we can't even figure out if there's going to be injury causation or addressability until we know how this rule issues. I would have thought you would have said let's assume the rule is as we think it should be, and it will at least – Exactly, Your Honor. Financial assurance requirements in some form. And for purposes of standing analysis, this Court does assume that we're correct on the merits. And for a case where we're seeking a procedure such as this one, we don't have to connect the procedure that we're seeking to the substantive outcome, so we can't show what rule EPA is going to issue. But if, for example, let's take the full plant in Kentucky that Marco and I are working on. They have their ash stored in an enormous, uncovered pit down the street from the subdivision. If EPA issues a rule, as we will urge, that puts a very high price on that activity and then puts a much lower price on safer storage practices, then that plant is going to have a powerful incentive to change the way they store that ash in a way that directly benefits Mr. Romine. And that's true for each of the facilities. We still have to speculate about how that third party would exercise its judgment in response to those incentives. So how do you distinguish Florida Audubon, which made that same point with respect to tax credits? Your Honor, Florida Audubon, I think, presented a very different fact pattern. There was a rule that governs fuel producers, and plaintiffs came in and said they had standing based on farmers that were going to do something differently. And the court said this chain of causation between the fuel producers that the rule regulates and the farmers who have to go through multiple parties to get any changes in their behavior, the court said that's just too attenuated. Here, we are arguing that the facilities that the rule applies to will respond to that rule. And this court... Wherein do you have to respond to that rule? We have... In a way that will reduce the pollution that your members are concerned about. Well, we have the fact that Congress intended this rule to have that effect. We have the fact that... But that's not going to work enough. So what do you have in particular? We have the fact that EPA also concedes that this is what the rules are intended to do. We have the fact that even the interveners here have conceded that these rules will have that effect. And we have this court's precedent, which has frequently looked to... frequently recognized that third parties will behave in their financial best interest. Where have the interveners conceded that they will change their behavior in a way that reduces pollution risk if some financial insurance regulation is promulgated? They haven't said specifically that they'll reduce their pollution, but they have conceded that these rules will have a powerful effect on their members. I would direct this court to the National Mining Association's motion to intervene at pages 5 to 6, where they say that these rules, if they are stringent, would have a direct operational impact on hard rock mining operations. Also in their appendix of exhibits at page 206, they said that these rules could cause some facilities to defer or forego opportunities to begin new mines or extend the life of existing mines. I would also point to page 304 in their appendix, where they recognize that a principal legislative purpose of these rules is to incentivize facilities to manage and store their hazardous substances safely. I would also note that this court in Abigail Alliance, 469F3-129, had no problem assuming that third parties would act in their own pecuniary best interest. The court found it to be a hardly speculative exercise in naked capitalism. And in two cases that have been decided since we submitted our briefing, Airlines for America, D.C. Circuit Case No. 14-1143, and Teton Historic Aviation Foundation, D.C. Circuit Case No. 13-5039, this court had no problem crediting basic economic principles as part of the standing analysis and found that it could assume that third parties would act in their own financial best interest. I would also note that this court has already held, and National Wildlife Federation v. Hoodell, which is cited in our briefing, that environmental groups had standing to challenge inadequate bonding for surface mining. And this court explicitly considered the causation prong of the standing analysis and rejected many of the same arguments that the interveners raised here. Can you tell me what the procedural posture was of National Wildlife Federation? Was it a mandamus action? It was not a mandamus action. It was a challenge to the substance of that rule. So at that point, the rule was before the court, and interveners argued that environmental groups did not have standing to challenge the bonding. I believe it was a summary judgment stage. So a basic stage preceding summary judgment, at least enough to create a question of fact. Mandamus seems almost like a final release stage, but you should have to actually prove by preponderance the fact that that was your standing. Is that your understanding of how this works? I would agree with that, Your Honor. But again, I would emphasize that this is a case where we're alleging a proceed form from a failure to comply with a required procedure. And so we simply can't show what EPA's final rule would say. I do want to turn to your point on Florida Audubon with a congressional statement. We do have in Friends of the Earth Belayed Law statements in the United States Supreme Court that we do give credit to this type of legislative determination. And the type of statement that this court didn't credit in Florida Audubon was a very different type of congressional statement. At issue there was a rule, and an individual member of Congress was speculating, not as to legislation, but as to this rule, what its effect might be for distant farmers. More jobs in the American heartland. And this court said that's not the type of statement that we are going to credit, especially because it runs counter to common sense and counter to economic principles that we do credit. And here we have precisely the opposite. We have an inactive piece of legislation and history showing that Congress intended this legislation to have a certain effect. That is far more similar to Friends of the Earth, and there the Supreme Court said that we do credit those types of statements. Turning to the merits, EPA has a clear duty to issue these rules based on its findings of risk. The language in the statute is clear. EPA shall issue financial assurance rules consistent with the degree and duration of risk posed by different industries. And EPA shall prioritize rules for industries that pose the highest risk of injury. How do we address the fact, I think, and I just don't know, how do we deal with this fact? We've got a really strong case, 30 years, and this thing never seems to move from the back burner to the front burner. There's always some other priority. And yet Congress recently looked at this very statutory provision, statutory requirement, and kind of said, well, when you get around to it, also give us 90 days' advance notice. And I can talk to X and Y and look at X and Y. Does that factor into my damages analysis at all, or statutory construction analysis at all? Your Honor, what Congress did is basically request the agency show its work. EPA already has to consider the availability of insurance, all of these other factors, as it develops these rules, and Congress said, we think those are really important, so we'd like to see it too, please, 90 days in advance. What Congress didn't do is actually amend the provision in the circle requiring these rules. Now, if Congress wants to remove this requirement, it certainly can. I understand that. It seems an awfully long time after they were supposed to do this. And one would expect Congress to go, in addition to show your work, come on around. Well, I think reading too much into congressional silence is a bit dangerous, because Congress fails to act all the time for reasons, who knows? When they act, of course, that's what then the agency must follow, but when they fail to change a law, I don't think that we should read into that, that in fact they intended EPA to continue to delay. If they wanted to take these rules off the agency's agenda, they could have done that, but they didn't. So I think with the provision that we have, they do have a clear duty to act. On EPA's clear duty, I would direct this court to the Supreme Court's opinion in Massachusetts v. EPA. EPA has taken a position here that it hasn't yet decided whether it's going to issue these rules for three of the industries. It may yet find they're unnecessary EPA claims. But in Massachusetts v. EPA, the Supreme Court considered very similar arguments from EPA. EPA said that it could choose not to regulate greenhouse gas emissions based on political consideration, the existence of other regulatory schemes, other criteria that are nowhere in the statutory provision that issue there. And the court said no, you must regulate or not based on whether this pollutant endangers human health and welfare, because that is what is in the statute. So to here, we have a statutory provision that says EPA shall regulate based on the degree and duration of risk. So where EPA finds risk, it then must regulate. And EPA has found risk here for each of these four industries. Turning finally to the track factors, EPA's 30-year delay is unreasonable. I would particularly like to highlight here that EPA has given itself multiple self-imposed deadlines, and each one it has missed. The horizon continues to recede. Without this court's intervention, this process threatens to drag on for a decade more. I see that I'm almost out of time. One of the requirements or promises they were going to put an outline, I wasn't quite sure when it was, in April 2015. That was one of the steps that they had promised activity by.  I do not, Your Honor. They have given dates in their regulatory updates, their regulatory agendas, for issuing the proposed rule, and that's what they've published multiple times and pushed back multiple times. I do know that we certainly do not have even a proposed rule for any industry yet. So were the court to get over the first two hurdles and reach the third, what is the nature of the precise relief you're seeking in the way of mandates? Well, Your Honor, initially in our petition we asked for final rules by January 1, 2016. I admit that that is now just around the corner, and we'd like to do very difficult deadlines for the agency to meet. In EPA's briefing, they have said that for the hard rock mining rule, they expect to have it substantially drafted by December of this year. And then they said that they need 90 days to get Congress advance notice. So we think they should be able to publish a proposed rule by no later than April 1 of the following year. It says they need three years to go from a proposed rule to a final rule. We think that's unreasonable. We think they should do that in one year. They go from proposed to final and complicated rulemaking all the time. Now that is just for the hard rock mining rule. For the other three rules, they haven't really given us much to work with. But when they initially, after they published their 2010 Federal Register notice, saying that there were these risks associated with these industries, in May of that year they anticipated it would take them 16 months to issue a proposed rule. So hopefully they've done something since then, and it will not take them less than 16 months. But we think 16 months at the outside for a proposed rule for those three industries and then a year to final for those as well. That's based on the agency's own estimate of how long it would take. And you say, given the track record, it's unlikely it will meet those deadlines. Absent intervention from this Court, we think these deadlines will just get pushed back and back. And, in fact, the schedule I've just outlined for the other three rules is not a schedule the agency is claiming now it will meet. It said it may consider thinking about these rules again at some point in the distant future. It's not giving us any kind of schedule. So you're saying April 2016 for hard rock mining. And what are you saying as to the other three? I would say 16 months from the date of this Court's order, because that is what EPA itself estimated it would take. 16 months for a proposed rule and then a year after that for final, because a year from proposed to final should be reasonable, should be doable based on other rules that are even more complex than this. Have we ever done that before? I mean, have we ordered an agency? It seems to me that what we say is report back to us on a periodic basis where you are and so forth. Well, Your Honor, yes, this Court has taken the report back to us approach, and we would be open to that here as well, but we need some sort of schedule that they're reporting back on. We may get around to these. But a never is not a schedule they can report back on. If they come back every six months and say we're still doing nothing, that doesn't get us anywhere. So an alternative option would be for EPA to submit a proposed schedule for these rules, the rationale for that, and an opportunity for us to respond, and then this Court could require EPA to periodically update it on its progress. We are open to that as well, but a never schedule is not one that works. All right, we'll give you some time to reply. Mr. Sullivan? May it please the Court, good morning. My name is John Sullivan. I'm with the United States Department of Justice, and I represent the United States EPA in this matter. And with me at council table is Rex Kobiak. He's with the Office of General Counsel of EPA. And, Your Honor, the petition for mandamus should be denied for two reasons. First, as Judge Millett was focusing on, the petitioners have not shown standing. And second, the petitioners have also failed under the track factors to show that the timing of EPA's promulgation of these regulations is unreasonable, much less so egregious as to warrant the extraordinary remedy of mandamus. What would be egregious if 30 years is not? Well, Your Honor, EPA has done a lot to deal with financial assurance requirements under CERPA. And EPA actually started trying to promulgate these rules in 1983 and realized that they didn't have the personnel or the contractor funding to do it. And, of course, it was the beginning of the program. They also had competing priorities. Did you do the rules framework that you promised in April of 2015? Did that get done? Yes, Your Honor. I'm pleased to report that EPA has completed the proposed rules framework. And they are now in the process... What's a rules framework? Pardon me? Is this an outline? What is a rules framework? The rules framework is basically the way different things in the rule are going to function. You know, for example, the way they will handle preemption or the way they will handle risk assessing. So it's an outline of work to be done? Pardon me, Your Honor?  No, actually, Your Honor, it's the outline or structure of the way the rule is going to work. So it is a draft of the notice of proposed rulemaking? I don't know if it's an actual draft of the notice, but it is a draft of the structure of the rule. I can't understand what it is from what you're telling me. I'm trying to put it in a box we're familiar with. I read Mr. Johnson's declaration, and I can't find any boxes. Okay. To be honest, I don't know what the substance of the structure of the rule is. How it's thought. Pardon me? You don't know the substance of this framework? I do not yet, no. What I do know is... Well, how do we know that it's anything? Well... That shows anything more than Mr. Johnson's declaration. Well, actually, Your Honor, EPA is going to be sending the proposed structure out for public comment by various interest groups. And, in fact, it recently... What is a proposed structure? I don't understand. Tell me, does it say Part A of our rule is going to propose 123, or does it say... It is a set of concepts of how the rule is going to work, from identifying facilities based on risk to estimating costs. But Mr. Johnson's declaration went through all that. Yes. So that's an outline and a framework. Yeah. And so how does this differ? Well, it's essentially going to be how these things work. For example, how do you estimate costs at a contaminated site? They've been studying that for 30 years. Well, they have prepared that. They had different options for that, and they apparently have decided on a proposed option for that. And they are now going to seek comment from the mining industry and stakeholders and cities and states because of the preemption issue. They haven't done this already? They have finished the structure of the rule, and they are now in the process of reaching out to various groups. What do you mean reaching out? Is this being published for public comment, or are you cherry-picking who you share it with? They are going to be sharing it with the different interest groups like... I'm sorry, they're cherry-picking? Is that going to be general public disclosure? Well, when the rule is published, Your Honor, they will submit a public notice. I'm talking about for this rule outline. Well, this is going to be the various interest groups that we've actually identified in the briefing. For example, state and local government, the mining industry, the insurance and financial industries, other interest groups. What about petitioners? Oh, other interest groups, too, yes. We will be communicating with them. And the purpose is to get their feedback. When? I don't know exactly with them. Probably soon. I know they just sent letters out to targets in the insurance industry, and I know that between late May and early August, EPA plans to start the small business interest outreach program under the SBREFA statute. So what you are representing to us today is that all of the factors that are outlined in Mr. Johnson's declaration, none of them have been completed. No, they actually have developed. Oh, you're talking about reaching out to the states, reaching out to the localities, reaching out to the affected industries. What you're telling me now is they're going to send out, or as Judge Millett's question elaborated, you have identified certain interest groups and parties that you're going to ask for their comments on this framework, which you're telling me is not a draft of a proposed rule. It's not the actual draft of the rule, or the actual language of the rule, but it's a draft of how the rule will work. And so, for example, on the issue of... You don't think that Congress made clear how the rule is supposed to work? Well, that's a big problem. Congress didn't make clear how the rule is supposed to work. But Congress gave you, said, build me a house. And the question is, what kind of house are you going to build? And now Mr. Johnson tells me they've been working with the architects, the engineers, all of these different people, all these years, but they still don't have any answers. Well, actually, they have a proposed structure of what they want to do with the rule, and they want to get feedback from the industry about it. Can I just ask you, have you personally read this structure? Have you seen it? I have not seen it. All right, that's all I need to know. And it's not in the record? It's not, because it was just completed at the end of April. Well, we didn't get any notice, any Rule 28J letters saying there was something new relevant to this case. No, we did not submit anything like that. And the only date we had was this April 2015 date, which you have now represented to Judge Millett, and this court, EPA, has done what it said it was going to do. Yes, Your Honor. Does that mean you're on target for meeting the rest of the schedule you outlined? Yes, we're on target for meeting the August of 2016 schedule for the proposed rule for the hard rock mining industry. And the reason it's going to take that long is because you want to get industry and other interest comments on this outline? Yes, we believe it's very important, because it's going to affect a lot of small businesses. There are some serious preemption possibilities, because many states now have mining regulations with financial assurance. But, you know, counsel, in this day and age when we have computers, we have information systems, we're not back in the horse and pony age. It's been 30 years. And it's amazing to me that you're telling us here today that you have not read or not even seen the very document that is supposed to assure this court that the agency is moving forward appropriately. Well, Your Honor, all I can say is I haven't seen it yet, but I know I've been in communication with the EPA about assisting them with outreach to stakeholders, including the mining industry and Petitioner's Council. Why hasn't that outreach been part of what was done for the last 30 years? Because I'm curious as to why it's not reaching now. Because right now EPA has the structure of the way it wants to run this rule. The language of CERCLA is very vague as to how we do things. Like what is a facility that should be regulated, and how do you assess risk? Agencies live and breathe banknotes and statutes. That's your operating area, right? So it was vague. I mean, that hasn't changed in 30 years. No, it has not changed in 30 years. But U.S. EPA has actually addressed financial assurance in many ways that directly deal with financial assurance in CERCLA and in RCRA for treatment, storage, and disposal facilities. So for many facilities today, in fact, many cleanups today, any cleanup going on today with a consent decree or with a unilateral order already has financial assurance in place. I know. So this is simplistic, and I can hear the responses. But I've been on this court long enough to know that if you said, we want you to do X, parties will either tell you we are already doing X or we're not doing X. But the agency has to define what is X, and usually it's a measurement. And all the parties will come in with a lot of explanations as to why that's too simplistic a question. But I'm back to, will the house ever get built? And Mr. Johnson's declaration gives me no assurance whatsoever. Well, EPA is committed to proposing this rule by its internal schedule of August 2016. So if the court thought that that assertion by counsel that the agency is committed is insufficient, what would you propose in the way of a schedule? You heard what counsel said in response to my question. Assuming we get over the first two hurdles. Yes, Your Honor. We believe that the schedule that EPA has proposed. It proposed no schedule as to the three other industries it's identified. We have not yet, Your Honor, and EPA has not yet. So what would you propose? For the other three industries? Yes. Your Honor, I would have to talk to EPA and brief them. Surely, surely, surely. In preparing for arguments, somebody anticipated Judge Rogers would ask. I'm quite serious. Well, for the other industries, first of all. Let me say this court, of which I was a member, has directed the agency to move expeditiously and made it very clear what the consequences would be if it did not. And the agency responded. Not quite as quickly as the court might have anticipated, but it did respond. And we had evidence of that. Now we have nothing. Well, all I can do is give you my word, and if that's not good enough, that's all I can do right here. The agency has given the court its word in other cases, too. But we had something to back it up. Well, I believe, actually, online now, there should be evidence of EPA's communications with the insurance industry, which would back up what I'm saying. Well, Mr. Johnson's declaration said they've had communications all these years. Well, not the communications that I'm talking about. EPA has targeted certain industries, certain contacts within the insurance industry about financial assurance availability. So, since you've had these conversations with EPA, what would you suggest to the court would be a reasonable schedule to anticipate for the agency to promulgate notices of proposed rulemaking for all these four industries? Well, for the hard rock mining industry, I would say that by August... By 2019, 39 years later, we would have a final rule? August 2016 for the proposed rule, and August of 2019... And what would you propose for the three other industries? Your Honor, I'm sorry. We don't have a schedule for those other three, but I'd also say... Do you see a framework? We don't have a framework for the other industries  I understand that, but it has to make a decision at some point, doesn't it? Yes, it will. And you're representing to this court today that EPA is unable to make any estimation of when it might reach a decision as to whether to do anything? At this point, they have not, because they're focusing on the hard rock mining rule, which has been a very difficult rule for the structural purposes. But EPA has very difficult issues all the time, very complex industries, very complex air, water issues that Congress has directed the agency to address. And it is astounding, let me just say, that the representations to this court today are as vague and open-ended as they are 30 years after Congress gave the agency an instruction. Yes, Your Honor. This is the best we have today. And so what about the future? That's what I'm focused on. And you can't give me anything as to the future either? Well, yes, I can. No, you're giving me 2019 for hard rock. For the hard rock mining rule. For the other rules. EPA isn't even required to do these rules under surplus for the other industries. Well, you know, but the agency has made some determinations. They've made determinations, Your Honor. And it has three steps. It's already made findings as to the harm being caused. Now it has to decide, for example, is state regulation sufficient? So we don't need to do anything. That may be true, Your Honor. Ask the states to tell you what they're doing. And say you want that by June. They have been researching all the states. No, but counsel, do you see what I'm getting at? We can stretch this thing out for the next 100 years. And that's what Mr. Johnson's declaration tells me. He's got three alternative approaches. He's going to review those, et cetera. And then Congress every now and then will say, you know, we want a report. We want to see what you're doing. Don't you think that something more needs to be given to the court under these circumstances? Well, Your Honor, I think that in terms of the hard rock mining rule, we are just in the point of going for outreach because we do have to. We also expected a response from EPA that says we're doing so many other rulemaking in various areas. And we have covered 90% of the problem. And the states have covered 6% of the remainder of the problem. So what we're dealing with here is only a 4% problem in my hypothetical. But I don't even get a sense of that from the papers that are before the court. Well, this rule actually is a lot different from the other rules that EPA has dealt with that you've talked about, like Clean Air Act, Clean Water Act, because it's going to be EPA and EPA alone that has to administer it. In most of the other programs, states administer it. So the whole cost of this rule hits EPA and it's going to cut back EPA's Superfund budget. And EPA is actually concerned that when the rules are implemented, that it's going to have to cut back on their cleanups because of the cost of this rule. Do you know what's happened in other cases when statutory requirements have been ignored and courts have not been able to get responses from the agency? Well, Your Honor, EPA is committed to... Are you aware? I mean, there are very serious consequences here. Yes, EPA is aware of that. And I don't think the court would enjoy, in any sense of the word, getting to that point. But surely you have to give us something to avoid that type of drastic action. Well, Your Honor, what I can say today is that the schedule we proposed for the hard rock mining rule,  So if the court asks for a schedule as to the three other industries, from what you're telling me, EPA would file a piece of paper that says we can't do that because we haven't made up our mind whether to do anything. EPA would have to evaluate a schedule and propose it to me. At this point, I don't know what that schedule would be for those other industries. But you just told me that they couldn't do that because they haven't made up their minds whether they're going to do anything. Well, they could provide dates by which they would make up their minds as to whether they believe it's necessary to issue rules for those other industries. But they haven't even reached that decision yet. They haven't reached the decision whether they believe those other industries warrant this type of regulation. Because financial assurance, it doesn't automatically come into the Superfund to benefit the Superfund, but it immediately costs the Superfund. EPA has a very tight budget. This program is going to be totally administered by EPA. It's going to be very costly, and when people provide financial assurance out there, EPA can't touch that money unless a facility that doesn't want to become a Superfund site does become a Superfund site, and then that entity has to default. Only then will that money benefit the Superfund. So it's highly speculative to EPA right now, and that's what it's concerned about, that EPA will even benefit from the financial assurance rules. EPA hopes it will, but the Superfund may not benefit, at least in the short term, from these rules. And therefore, EPA is concerned that it will undermine the main purpose of CERCLA, and that is to clean up sites. Isn't that Congress's judgment? Isn't that Congress's judgment at the end of the day? They said do this. You're the ones in charge of funding, and it's not as though we can go, now, gee, looks like a bad call by Congress. Let's ignore it. I mean, it just seems to me that argument isn't for us. EPA has access to members of Congress, and they need to explain that to them, but so far for 30 years, Congress hasn't changed its mind. And, in fact, last year said we still mean it. Well, Congress – my interpretation of what Congress said is a little different, but it is what it is. Do you think anything they said altered your deadline? Well, I think the big concern is, is there really financial assurance out there? They know how to fix the statute. I don't think they want – I mean, we can't define unwritten meaning from what they said. They put rules in there for going forward. Now, most of it seems to be stuff you should – they said show your work, stuff you should have already been doing for the last 30 years. Well, for example, Congress – the actual words of Congress was, we will have insurers policing insurance as they manage hazardous substances. But CERCLA required that the General Accounting Office back in the 80s do a study of the insurance industry, and they concluded that there was no insurance for pollution. So where is financial assurance going to come from? That's something that EPA is studying right now with the insurance industry, and that's something that Congress seems concerned about each year. Is there really financial assurance available? Right now, we don't know, but we're studying that. I thought you said that you're requiring financial assurance in all your consent decrees. We do. Okay, and you must know where this financial assurance comes from. A lot of times it comes from self-insurance, or you have PRP groups that put money into a trust fund. Well, but, I mean, so you have ideas for financial assurance, and they're already being implemented. So this argument that you don't have any idea where financial assurance will come from, I guess I'm not understanding it. That's not what I'm saying here. What I'm saying is we're trying to investigate, is there really in the financial industry and in the insurance industry, is it there? Is there financial assurance available for pollution risks? At this point, we're investigating it. We don't know. And the General Accounting Office back in the 80s found that it wasn't there. And so Congress is asking EPA, you better make sure that there is financial assurance out there. And so we are investigating it. Is this outline or framework that you did in April a publicly available document? When you're disclosing it to everyone. Not yet, Your Honor. But when the document goes out for comment by stakeholders, it will be. I thought you said it had already been sent out to the insurance company. No, we sent letters out to the insurance industry to try to start a dialogue with them about issues relating to financial assurance. And I believe that is listed on the Internet. You don't have anything more than soon for when that will be available? Well, I do know, for example, that the goal for the small business interest is between late May and August. That's the goal for starting that process. So there will be something done by at least that time. And that's just sending the framework out. And yet you still have time for that to come back and respond to it and have a draft rule by a year later? Well, we'll have a draft rule done by later this year or probably early next year for interagency review. So it will be the structure they have can be used to develop the wording of the rule. The structure is the concepts of how they're going to handle everything in the rule. And once they do that, they can put it into words. What they really want now are comments from the stakeholders and especially states that could have preemption issues here with their regulatory programs for mines. So that's what we're trying to do right now, Your Honor. Can you tell me why John Rutherford's declaration doesn't establish standing? It's very particularized. He talks about not just backwards harm but forthcoming harm, risk, intending mining action that's going to compound existing environmental degradation. And no concerns in this area because it's happened again and again and again that after that damage happens, there's nobody there to pay for the cleanup. Well, yes, Your Honor, I can. First of all, in the Stibnite mine, EPA itself has done cleanups at that site by issuing orders. When you talk about the Stibnite mine, I'm talking about the environmental harm, substantial risk of environmental harm that Midas Gold is going to create as it goes forward with its own declaration of mining activities. Well, if Midas Gold goes forward, right now my understanding is their plans are on hold because of citizen interest groups out there. But in any event, if you assume that their activity goes on, their activity will largely be on Forest Service land, and the Forest Service now has mining regulations that include financial assurance. And Mr. Robinson admits that and doesn't say why those regulations won't provide for financial assurance. He said those bonds have not been enough in the past. Well, based on what's going on now, he hasn't shown why they won't be good in the future. How do you ever show they won't be good in the future other than saying it wasn't good enough the last three times? Well, right now, we don't even know if Midas Gold is going to do anything because they haven't discovered any gold. So it's highly speculative whether Midas Gold is going to mine in. How speculative? I mean, we're investing an awful lot of resources in exploration, and they've done enough studies to figure out that they're going to have to have ongoing water cleansing processes in this area. So it seems not speculative to me. Well, at this point, we don't know. If you assume that they're going to do something, then they will be subject to the Forest Service regulations and EPA will be communicating with the Forest Service about the hard rock mining rule in the near future to coordinate the efforts. And that's one of the things that Congress wants EPA to do, coordinate with the Forest Service. So it's even possible that if Midas Gold does decide to mine, they could be subject to the hard rock mining rules here that EPA is working on. Or, depending upon the consultation... So that's why you have them standing, right? They're actually in a position to be substantially invested in this area, and they're the ones who would likely be subject to any financial assurance regulations that you put out there. Well, first of all, we don't know whether they're going to do anything. I think right now it's highly speculative as to whether they're actually going to mine and whether there will be any sort of financial assurance problem. In all probability, they will have to provide financial assurance, at least under the Forest Service regulations. I just don't know. Does the exploration process itself create risk of environmental harm in an area where there's already a lot of contamination in the water and the rock? I mean, they could in very small quantities. Your Honor, the main problem with mines is that once they operate over time, the waste areas are so huge. So it's a simple exploration. My understanding of what MIDUS is doing is they're actually going to be exploring waste rock piles to see if there's sufficient gold in those waste rock piles so that they could extract it. So they're actively now engaged in exploration activities in that waste rock area? My understanding is that it was put on hold because of citizen groups' opposition to their activities.  My understanding is that their exploration process has been put on hold because of that. Exactly what the status is today, I'm not sure. But we don't know if they will ever do work. They may decide it's not economical. We just don't know at this point in time. But at bare minimum, they will be subject to the Forest Service regulations, and EPA will be communicating with them. And to the extent any of their work is on state land, there are state regulations now in place for mining and for financial assurance that were not in place when Superfund was passed back in 1980. All right. Thank you, Your Honors. Mr. Giannotto. May it please the Court, my name is Michael Giannotto, and I'm here on behalf of the National Mining Association. I'm happy to answer any questions you have off the bat. But if they're not at the outset, I'd like to focus my limited time on two issues. One is that mandamus should not issue here because there is no – Don't you need to argue whether you have a right to even intervene before you can talk to us about the merits? Well, I think we do have a right to intervene, Judge Millett. EPA – I'm sorry, the petitioners here are asking for specific relief. They're not asking that EPA – Is it your position that EPA could walk away from this express regulatory interest in issuing a hard rock mining rule? I thought that was your position. I think that is correct. But the position of the petitioners is that EPA cannot do that, and they have to issue a rule for hard rock mining. And standing is determined by the claim that is being made. And so if the petitioners prevail, there will be these extra financial assurance burdens on us. And the petitioners stated when they were arguing, look, we've admitted these will have great incentives. I don't think they will. But the burdens they will impose on us are unnecessary financial burdens because right now modern mining and financial assurance is only going to apply to current and future operations. Where did you in your motion to intervene establish standing? I think in our motion to intervene and the attached affidavit. They were attached to your reply? They were attached to the reply. On the other side, did nobody have any chance to address those in their briefing? I mean, I thought it was pretty established in this court and in the law generally that if you want to intervene, you need to establish standing, and you're supposed to do that in your opening documents so that other people have a chance to respond. And so I'm not sure what we're supposed to do with your application, which the motion itself does not do anything to establish standing in the reply. If you're correct, you put declarations there, but we don't normally entertain arguments based on the motion. But the motion of Freeport, for instance, attached the declaration of Mr. Cobb, and that's an NMA member. Okay. And so we relied on that in Part 2. Well, then maybe Freeport gets to intervene, but I don't see how that lets the National Mining Congress intervene. Your Honor, my understanding is that when standing is pretty much obvious, which we thought it was here, we didn't have to submit affidavits, and we did it out of an abundance of caution. Because in Part 2 it's not as obvious if your merits argument is rule, what rule? They don't have to do any rule. We're not committed to any regulation of us at all. That is our argument, but the petitioner's argument is they have to have a rule, and it will apply to the mining industry. And so we think it's fairly obvious that it's going to apply to some or all of our members. And that's why we did not submit affidavits with the original petition. We frankly didn't think they would challenge our standing. But in any event, we submitted them out of an abundance of caution with a reply brief so the court could see that, in fact, we do have a direct and substantial interest in this because we believe that if petitioners prevail, and EPA has to regulate hard rock mining, that will impose increased burdens on us. In terms of duty, I'm talking about duty as to the mining industry. There's nothing in 108B that says that EPA has to regulate the mining industry, and I think the petitioners agree with that. There's nothing in the legislative history that says you've got to go after mining. But the petitioner's argument is that the duty was created when EPA, in 2009, said we announced that the mining industry poses dangers and we're going to go after them. The duty is to identify the absolute first priority area that they want to address. They had to come forward and identify that first area of focus to be financial assurance regulations. The statute says you guys figure out what the right one is. It doesn't say mining versus petroleum versus chemicals. It says go find the one that needs to be regulated first. And they said that's hard rock mining. And we think they're wrong. We think they're wrong on the dangers, as was explained in the brief. If a rule ever issues in our lifetime, you'll be able to challenge that rule on exactly the arguments you're making now. It seems a bit premature to say in advance of even a notice of proposal making that you're injured, that we should be addressing these arguments. Well, I think you're right. You know, you shouldn't be addressing these arguments. But I think we should be able to argue that when they issue a proposal. And they should be able to decide once they get the comment, once they consult with us, with the states, with the BLM, with the Forest Service, with everyone, that they made a mistake. And that, in fact, there is no danger here from current and future mines. There is no need for financial assurance. There is no need for regulations consisting with a degree of duration of risk. And say, so we're not going to regulate the mine industry. So let me ask you, are your members prepared promptly to fully inform EPA of all the things you have just said? Absolutely, Judge. And have you been in that position for the last 30 years? Well, Your Honor, they only identified hard rock mining in 2009. That's when they first, they didn't identify it. And even though they didn't ask for comments, after they identified comments, after they identified hard rock mining, we did submit comments. They didn't ask for it, but we did. The National Mine Association did. So you've been available at least since 2009 to provide EPA with all the information it would need to make a decision about rulemaking? We've been available and have tried to contact the agency. So have a yes answer? Yes. Not just a no one. You said you, I mean, I saw you actually sent in a lengthy, I think it was you, maybe it was one of your members, sent in lengthy submissions to EPA discussing these issues about current coverage, current assurances, why you don't need to be regulated. They've already got that in their files. They have that, and they haven't officially responded, although in the Johnson affidavit he mentions that they've gotten comments along those lines, and that's one of the things they have to work through, whether there really is a need here for this. When did you send that in? Was that sent in 2009 or 2010? It was sent in, they asked for comments on the other three industries. No, no, I'm talking about, you said after they came out and said, we think we have to go after hard rock mining first, and then you all officially responded. You sent in what was a very in-depth, in my view, I'm not an expert, but in-depth submission. It was in the winter of 2009, 2010, that time period. I don't know exactly when, but it was around then. It was pretty shortly after they had announced the hard rock mining as the priority. So they've had a wealth of information from you all already since 2009. They have, Your Honor, and we've been willing to meet with them, and we're still willing to meet with them, and we want to make sure this is done right, but one of the things we want to make sure of is that this court does not do something like say, you've got to regulate the mining industry. I think that that you cannot do because they can decide they were wrong after they review our comment, after they hear from everybody else, and they can decide there is no risk here or no significant enough risk, or there's adequate financial assurance from other agencies, and that's very important. We think the evidence that we've put in shows that, and what they've relied on are legacy mines, old mines, not current future mines. Sort of the notion that the past is a predictor of the future. There's no indication all of your members are going out of business, is there? There is no indication that we're going out of business, and the past is not a prediction of the future. I understand that, but I mean, history, just high school history, mining and hard rock mining has been going on in this country for a long time, and there's no representation that this type of work is about to cease. Correct her, Donna. It's not about to cease, but nowadays, before you can start a mine, you have to submit a detailed application to the state or the federal land management agency. You have to go through the NEPA process if it's on federal land. You see, you heard me when I was asking counsel. EPA hasn't made that type of argument to the court. That's why we proposed intervening, Your Honor. I understand that point, but we don't have anything before us to support this analysis. What we have is Mr. Johnson's declaration. No, Your Honor, you have the mining appendix, which has the comments that we submitted to EPA. We have your comments, but as you say, you're still waiting to hear from EPA. Correct, Your Honor. We're still waiting to hear from them. That's right. Have you sent any additional, I mean, you always send information to an agency. Have you sent any additional information since 2009, that submission? I think different members of the mining industry have, and some have met with EPA workgroups or whatnot to work through things, and we want to meet with them. EPA has to set up this small business advisory panel, advocacy panel I think it's called, and 81% of the mining companies that will be subject to these rules if they are promulgated are small miners, and we've tried to work with them to set up that panel. I think people are waiting for EPA to have some sort of framework so that we can help them more. EPA says it has a framework. We don't know what it is, but they say they have a framework, and what's mind-boggling is the type of argument that's being made when surely a framework, even taking into account changing times, is something that you would assume any management person would have developed almost from the beginning. I can't speak for EPA. I know you can't, and I hope you will convey to your members the difficulty that this situation places the court in, where we have a statute that Congress has passed, and the agency has had a number of decades to respond. I understand, Your Honor. Again, I point out that for hard rock mining, they only identified that industry five years ago, five and a half years ago. Now, I'm not saying five and a half years is a short time, but from our point of view, our concern is that if the agency gets rushed through this, it may reach the wrong decision. For instance, when they identified mining, you told me they had your information from your members since 2009. To use the word rush in that context is difficult to understand. Yes, Your Honor, but once they come up with a framework, and Mr. Sullivan said they're going to share it with the industry, so hopefully they will, and we'll get a chance to comment on it. But you understand my point about if you have the data, you could look at it, and you might decide we don't need to do anything, but that's not what EPA is telling us now. They're telling us they are, as far as I heard counsel today, and in the brief, and in Mr. Johnson's declaration, they're proposing to have a proposed rule by the end of this year, although I heard that slip a little in counsel's statement, but still, that's the representation to the court. I thought the representation was a proposed rule by August 2016, so about a year and a quarter from now. I think he said for internal government. Correct. Correct. But, Your Honor, our view is that once they do look at our comments, and we don't know if they have, and once they hear from us, they can still change their mind. Of course they can change their mind. Well, that's what the petitioners are asking for. They want to hear what they're saying, and they can change their mind. Let's hear from the agency. Let's do something consistent with the instruction from Congress, and you're representing that your industry, not your industry, excuse me, your members have provided EPA with all the information that it needs to make a decision, and EPA apparently agrees because it's telling us it's ready to get this proposed rule. We've provided the agency with information showing that mining doesn't pose dangers or significant dangers and that they're taken care of by existing financial assurance. We don't know whether EPA has given that any credence or looked at it, but at some point if they propose a rule and we think they're wrong, we can submit comments, and if they don't accept our comments and we still think they're wrong, we can be back in this court saying they're arbitrary. So let's get started. And that's what they've been doing. According to the Johnson Affidavit, they've been doing various things. But, again, I'm not here to speak for EPA. I just want to make sure there's enough time so that we can be heard before them and they can change their minds if we convince them that they're incorrect on a structure of a rule. Even if they decide to go forward, they're going to propose a rule structure and what financial assurance mechanisms and in what amounts, and we're going to want to comment on that because even if we believe there should be some regulation. Well, how about mining is subject to, I think part of your point, and subject to a lot of regulations including Forest Service or BLM financial assurance requirements. How much time period were you given to comment on those rules when they were first created? The BLM rules that are now in existence were promulgated, I believe, at the end of 2000. I don't remember the exact comment period, but there was a whole NRC study before that. I don't know if you – I was cited in our briefs in 1998, and there were a lot of efforts both in Congress and Interior, and this was developed with a lot of consultations before the rule was even proposed. There was a lot of consultations. Well, it seems like they're doing a lot of that here, and so I think it was just an ordinary comment period for that rule. Correct. It might have been extended because it was a major rule or something,  No, it was not for years, John. It was not for years? No. I just want to – I've run out of time, but I want to comment on the Robson Declaration, because you mentioned it. You know, part of this declaration deals with a wholly abandoned coal mine and financial assurance. I'm more concerned about that's what we're looking for. Right. Well, you asked if the past was prologue to the future, and I don't think it is. My understanding right now is that at that mine site, Midas Gold wants to prospect, which is even before exploration, and I don't think they're even doing that yet. But before they can explore, and certainly before they can mine, and unlike what happened in the past with Bunker Hill, they are going to have to submit a proposed plan of operations to the Forest Service. They're going to have to submit proposed plans to show how they're going to protect the environment, the monitoring they're going to do. They're going to have to have a bond to make sure they can clean it up afterwards. The process will go through NEPA, because it's the Forest Service, and they will have to make sure, or they will have to take all precautions to make sure that nothing's going to go wrong. I just have to say it. Mr. Robinson says – right, Mr. Robinson. He says, you say, and he says, bond, schmond. It's never been enough in the past. Look around Idaho. It's littered with pollution from companies that have bonds. I don't know how he can say they'll have to have every single assurance there. I assume the whole reason Congress wanted EPA to do this is they didn't think these other mechanisms by themselves were sufficient, and Mr. Robinson says it hasn't been sufficient in the past. I think he points to one side in particular. The rest he just mentions are historic mines. He doesn't mention whether there's – There were bonds and other assurance mechanisms were not enough. They were not enough then, and the regulations weren't enough then to prevent catastrophes from happening. The regulations are now sufficient. The bonding is sufficient. They have the burden of proof on standing, and they haven't satisfied it. Thank you very much. All right. Does Liz Gooden have any time left? All right. Why don't you take two minutes? Thank you, Your Honor. I'll be brief. The idea that other rules out there are adequate to solve this problem is just wrong. As Judge Millett has pointed out, this is for Congress to decide that EPA needs to enact these rules, even though there are already other rules that provide small amounts of inadequate assurance for a patchwork of sites, but Congress and EPA need to issue these. So that's the bottom line. I would also say that EPA's own findings – EPA has found that current assurances are not adequate, particularly in the case of mines, to cover groundwater remediation and surface water remediation. This is often very expensive, very complicated. Some mining sites require water treatment in perpetuity, and EPA's findings, which are cited in our briefs, are that current assurances don't cover that kind of work, and that's the problem we're trying to address here. Can you address just briefly how Mr. Robinson's declaration satisfies Clapper's requirement? Well, Your Honor, in Susan B. Anthony, I think the Supreme Court says that it was either certainly impending or substantially likely, and I think that... How do we know it's substantially likely if we aren't clear yet on whether MIDUS is going to do anything else? I think MIDUS is at the exploration stage, and we do think that if they are finding gold there, that they are going to continue mining. But I would again say that that's not the only declaration we've submitted. So, for example, Mr. Weber's declaration, they're currently mining. They have been for some time. They are continuing to mine. So MIDUS, it's true because they haven't actually gotten to the point that they have started a full-fledged operation. I see how there would be some questions there. But the mine in Bingham County that Mr. Weber discusses, they are currently mining there. There's no question that they're going to continue. No one has offered any suggestion that they're going to shut their doors tomorrow. Is that current mining operation already subject to financial assurance requirements? They are not under CERC right now. No, but under other things. So is there a showing, again, of substantial likelihood that the existing financial assurance obligations won't be enough? Well, you're on that case. Or is it your view that we don't have to have issues in the Antennae or Clapper? I'm just trying to navigate these. It's a difficult area to have. To articulate the injury. Your Honor, in— Sorry. When you're trying to force regulation, it's not even a little bit part of your show. It doesn't mean it can't be shown. Your Honor, in National Wildlife Federation v. Hodel, and also in Sierra Club v. EPA, 129, F-3rd, 137, at page 139, this court said that the existence of alternate regulatory schemes does not defeat standing to challenge an agency's failure to issue a separate regulatory scheme, even if it addresses the same problem that Congress requires. So Congress saw a need for a different regulatory scheme. The Supreme Court and Clapper seem to have a different view of when there's alternative ways of skinning the cat, as it were. I'm sorry, Your Honor? In Clapper, they thought—the Supreme Court, which is more recent, thought that it was relevant that the government had alternative ways of doing the same thing that have varying on understanding. It could be shown that there were different ways of getting the information within a foreign communication. Well, Your Honor, we've shown that the—or at least Mr. Weber has alleged, and nobody has contested, that the existing reclamation plan at the Bingham County line has not been adequate. He's alleging that the Great Salt Lake is incredibly contaminated, that the wildlife that relies on that habitat is suffering, that he's unable to view it because of the contamination. So we're saying that the bottom line out there is not doing the job. That mine is continuing to release an enormous amount of hazardous substances, and that's continuing to injure Mr. Weber. I would like to briefly address the National Mining Association's argument that the agency can still change its mind, but doesn't have to issue these rules. All right, but make it quick. Oh, sorry. EPA, like any other federal agency, can change its mind where that change is supported by evidence in the record, where that change is rational, and where the agency offers some explanation for that change. We seriously doubt whether they could meet that bar here, given what they've already found, but right now that question is academic. We have findings from the agency that there is serious risk, and they have not retreated from those findings, and so they do have to issue rules. I'm out of time. Unless the court has further questions, we ask the court for an answer. Petition forwarded by Dana. All right, thank you.
judges: Henderson, Rogers, Millett